CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
for Roanoke
OCT 21 2008
JOHN F. CORCORAN, CLERK
BY: /s/ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TION TERRELL, | ) | |
| Plaintiff, | ) | Civil Action No. 7:07-cv-00518 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| L.R. MONTALBANO, et al., | ) | By: Jackson L. Kiser |
| Defendants. | ) | Senior United States District Judge |

Tion Terrell, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983; the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc et seq; and the Free Exercise clause of the First Amendment. Terrell challenges the defendants' decision to defer Terrell's Common Fare Diet application for six months. This matter is presently before me on Terrell's and Montalbano's cross motions for summary judgment. For the reasons set forth below, I will grant Montalbano's motion for summary judgment as to the First Amendment claim and deny Montalbano's motion for summary judgment as to qualified immunity and the RLUIPA claim. Further, I will dismiss Terrell's claim against Chief Operations Officer, Offender Management Services and dismiss Terrell's motion for summary judgment.

I.

Terrell arrived at Red Onion State Prison (Red Onion) on April 3, 2007, and Terrell applied for the Common Fare Diet (Diet) on June 14, 2007. The Diet is a religious kosher diet offered at all Virginia Department of Corrections (VDOC) institutions and accommodates inmates' religious dietary needs that cannot be met by the standard menus. (Def's Aff. 1.) Terrell stated in his application that he practiced Islam since 2003, the Diet was mandated by his Islamic beliefs, and he previously ate the Diet at another institution. Terrell stated that he asked prison

officials at Sussex I State Prison (Sussex I) to remove him from the Diet in June 2006 because he claimed the portions were improper, the food was undercooked, and the vegetables were often spoiled.

Although his June 2007 Diet application was initially approved at Red Onion, his application was subsequently deferred by Montalbano on August 16, 2007, for six months so the prison could evaluate the sincerity of Terrell's religious beliefs by his participation in religious activities and religious holiday observances. Terrell filed a regular grievance form on August 31, 2007, appealing the decision to defer his request for the Diet. Terrell received a Level II response from the defendant Chief of Operations, Offender Management Services on October 12, 2007, who deemed Terrell's grievance unfounded. Terrell's second application for the Diet to Red Onion officials was approved on June 5, 2008.

After exhausting his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), Terrell filed this action on October 29, 2007, seeking injunctive relief,[1] costs, and damages against the defendants in their individual capacities. In his pro se complaint, Terrell argued that defendant Montalbano, the chair of the Common Fare Diet Review Committee (Review Committee), violated Terrell's rights under RLUIPA and the Free Exercise Clause of the First Amendment by deferring his Diet application, forcing Terrell to violate his sincerely held religious dietary beliefs. He also alleged that the unnamed defendant Chief of Operations, Offender Management Services demonstrated deliberate indifference to Terrell's First Amendment rights by failing to overrule Montalbano's deferral.

---

[1] Terrell's amended complaint sought injunctive relief to compel Montalbano to approve his Diet request. Since Montalbano has approved his subsequent request for the Diet on June 5, 2008, (Pl.'s Mot. default J. Ex. 2 (docket entry #46)), his request for injunctive relief will be denied as moot.

2

Montalbano moved for summary judgment on March 24, 2008, asserting that the deferral was reasonable in order to determine whether Terrell's religious beliefs were sincere. Montalbano also alleged that she is entitled to qualified immunity from any damages award because she was not on notice that applying a six-month deferral period to Terrell's application violated his constitutional or statutory rights.

In her affidavit, Montalbano stated that a Red Onion inmate's request for a special religious diet is considered by the Institutional Classification Authority (ICA) and the Central Classification Services (CCS). To decide a diet request, the ICA and CCS consider a variety of information, including the inmate's attendance at prison religious services or group meetings, the inmate's observance of religious holidays, the inmate's disciplinary record, and any additional evidence the inmate presents during an ICA hearing. Montalbano stated that the Review Committee deferred Terrell's request so that Terrell could demonstrate the sincerity of his religious beliefs by participating in religious services, programs, classes, and holiday observances, and by contacting the Institutional Chaplain's office for religious guidance, literature, or information. The Review Committee noted that Terrell's recent history of disciplinary convictions suggested behavior incompatible with a sincere religious belief. Finally, Montalbano stated that it is an inmate's responsibility to follow-up with CCS after the six-month deferral period and that as of February 26, 2008, the Review Committee had not yet received another Diet request from Terrell.

Terrell filed a cross motion for summary judgment asserting that: 1) there was no rational connection between the decision to defer his application for the Diet and a legitimate governmental interest; 2) the deferral placed a substantial burden on his religious exercise; 3)

3

Montalbano failed to utilize the least restrictive means available to further any governmental interest; and 4) Montalbano is not entitled to qualified immunity because it was clearly established that prison officials may not substantially burden an inmate's First Amendment right without a legitimate penological reason. In his attached affidavit, he stated that he has a sincere religious belief that he must eat a diet of foods slaughtered, prepared, and served according to Islamic or Jewish law; he participated in every available religious program, service, class, and holiday since becoming a Muslim in 2003; and he has no available alternative to practice his religious dietary beliefs outside of the Diet. He noted that he removed himself from the Diet when he was an inmate at Sussex I because he lost weight while avoiding the Diet's spoiled produce and undercooked meats. Despite going off the Diet, however, Terrell stated that he maintained his dietary beliefs as closely as possible without going hungry. He further stated that he contacted the Institutional Chaplain upon arriving at Red Onion, but he was told that the materials he sought were not available.

II.

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts and the inferences drawn from those facts in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Federal Rule of Civil Procedure 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317,

4

322 (1986). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Ordinarily, a prisoner proceeding pro se in an action filed under § 1983 may rely on the detailed factual allegations in his verified pleadings to withstand a defendant's motion for summary judgment and affidavits having conflicting versions of facts. Davis v. Zahradnick, 600 F.2d 458, 459-60 (4th Cir. 1979). While the court must construe factual allegations in the nonmoving party's favor and treat them as true, the court does not need to treat the complaint's legal conclusions as true. Estate Constr. Co. v. Miller & Smith Holding Co., 14 F.3d 213, 217-18 (4th Cir. 1994).

### III.

I first consider Terrell's constitutional claim under the Free Exercise Clause of the First Amendment, brought under 42 U.S.C. § 1983. Terrell alleges that the defendants violated his First Amendment right to practice his religious beliefs by deferring any action on his Diet application for six months. Claims under the First Amendment require much less scrutiny of prison regulations than RLUIPA requires. Freeman v. Tex. Dep't of Crim. Justice, 369 F.3d 854, 857-58 n.1 (5th Cir. 2004) (cited in Lovelace v. Lee, 472 F.3d 174, 199-200 (4th Cir. 2006)).

The Free Exercise Clause of the First Amendment extends to prison inmates. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987); Morrison v. Garraghty, 239 F.3d 648, 656 (4th Cir. 2001). Terrell stated that he has been a practicing Muslim since 2003, and he asserted that his dietary restrictions arise from his sincerely held religious belief that he must eat food slaughtered, prepared, and served according to Islamic or Jewish law. Although he voluntarily removed himself from the Diet while at Sussex I due to the food's alleged poor

5

quality, he stated that he ate "as closely to [his] religious dietary beliefs as possible without going hungry" by eating the no-meat diet. (Pl.'s Aff. 1.) He claimed that he was forced to eat from the regular diet to alleviate a stomach condition created from the large quantity of beans he ate while on the no-meat diet, but he returned to the no-meat diet once the condition improved. Id. at 3-4. Viewing Terrell's factual assertions in the light most favorable to him, I am satisfied as a threshold matter, that Montalbano's refusal to provide the Diet implicated the Free Exercise Clause.

However, an inmate's constitutional rights must be evaluated within the context of their incarceration. The Supreme Court has long cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration[,]" Procunier v. Martinez, 416 U.S. 396, 405 (1974) (dictum), and thus, "courts must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration[,]" Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006).

This deference is achieved by a rational basis test. I must consider four factors to determine if prison regulations are reasonably related to legitimate penological interests:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right ... remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Lovelace, 472 F.3d at 200 (quoting Turner v. Safley, 482 U.S. 78, 89-92 (1987)). When applying

6

these factors, I must "respect the determinations of prison officials." United States v. Stotts, 925 F.2d 83, 86 (4th Cir. 1991). The plaintiff bears the ultimate burden of establishing that a prison regulation or decision is unconstitutional. Hause v. Vaught, 993 F.2d 1079, 1082 (4th Cir. 1993).

Applying Turner's rational basis factors to this case, I find that the defendants' decision to defer any action on Terrell's application was reasonable. First, a sufficiently valid, rational connection exists between the deferral policy and the prison's interest to control costs and to reduce administrative burdens. Second, the deferral policy does not deprive Terrell of all forms of religious exercise. To the contrary, Terrell stated that he participated in every religious program, service, class, and holiday available to him since becoming a Muslim in 2003. See O'Lone, 482 U.S. 351-52 (holding the relevant inquiry for this factor is whether the inmates have been denied *all* means of religious expression, not for the particular religious practice allegedly violated). Third, prison resources could be adversely affected if Terrell received the Diet without having to demonstrate that his religious beliefs are sincerely held. Courts have recognized that the cost of providing special diets can be significant. See Kahey v. Jones, 836 F.2d 948, 951 (5th Cir. 1988); Acoola v. Angelone, No. 7:01cv01008, 2006 U.S. Dist. LEXIS 62574, at *12 (W.D. Va. Sept. 1, 2006); Hawkins v. Mills, No. 7:04cv00216, 2005 U.S. Dist. LEXIS 15594, at *3 (W.D. Va. Aug. 1, 2005). Moreover, any perceived differential treatment among the inmate population could pose a threat to prison morale. Kahey, 836 F.2d at 951. Finally, there are no obvious, easy alternatives to the deferral policy that suggest an exaggerated response. Thus, applying due deference to Montalbano's concerns regarding the allocation of limited prison resources, I find that Montalbano has shown that the Diet's deferral policy is sufficiently

reasonable to pass scrutiny under the Turner test and does not violate Terrell's First Amendment rights. Accordingly, I will dismiss Terrell's First Amendment Claims as to both defendants and grant Montalbano's motion for summary judgment as to this claim. Furthermore, I will terminate Chief of Operations, Offender Management Services as a defendant in this civil action since there are no remaining claims against him.

IV.

The next question is whether Montalbano is entitled to summary judgment for qualified immunity. "Qualified immunity is an affirmative defense that shields public officers performing discretionary duties from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Lovelace, 472 F.3d at 196 (internal quotation marks omitted) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity protects government officials from "bad guesses in gray areas" and ensures that they may be held personally liable only for "transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

I apply a two-part test to determine whether Montalbano is entitled to qualified immunity. Under the first part, I consider whether the facts alleged, taken in the light most favorable to Terrell, show that Montalbano violated Terrell's statutory rights under RLUIPA. Lovelace, 472 F.3d at 197. Terrell satisfies the first part of the test since Montalbano failed to carry her burden of showing compelling government interest. See infra § V. I next consider whether, at the time of the violation, the contours of the right were sufficiently clear that a reasonable official would understand what she is doing violates that right. Anderson v. Creighton, 483 U.S. 635, 640 (1987); Miller v. Prince George's County, 475 F.3d 621, 627 (4th Cir. 2007). The inquiry of

8

whether a right is clearly established "must be undertaken in light of the specific context of the case," and "the unlawfulness of the conduct must be manifest under existing authority." Lovelace, 472 F.3d at 198 (internal quotation marks omitted) (quoting Vathekan v. Prince George's County, 154 F.3d 173, 179 (4th Cir. 1998)). Facts warranting qualified immunity are clearly established when a legal question has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state[.]" Wallace v. King, 626 F.2d 1157, 1161 (4th Cir. 1980). As long as the conduct's unlawfulness is manifest under existing authority, the exact conduct does not need to be specifically proscribed. Wilson v. Layne, 526 U.S. 603, 614-15 (1999).

By the time Montalbano deferred Terrell's Diet application, the Supreme Court in Cutter v. Wilkinson, 544 U.S. 709, 719-26 (2005), declared Section 3 of RLUIPA constitutional. Thus, the law was clearly established that prison officials may not substantially burden an inmate's right to exercise personal religious beliefs without some compelling penological justification. Furthermore, prior to the instant case, the Fourth Circuit clearly stated in Lovelace, that "[u]nder both the Free Exercise Clause and RLUIPA in its most elemental form, a prisoner has a clearly established right to a diet consistent with his religious scruples" and "[a] prison official violates this clearly established right if he intentionally and without sufficient justification denies an inmate his religiously mandated diet." 472 F.3d at 198-99 (internal quotation marks omitted). Because, as discussed below, Montalbano failed to substantiate any penological justification for deferring Terrell's application to the Diet, I cannot conclude as a matter of law on the current record that it was objectively reasonable for Montalbano to believe that denying Terrell the Diet for six months did not violate Terrell's rights under RULIPA. Accordingly, Montalbano is not

9

yet entitled to qualified immunity from any damages award.

V.

I next consider Terrell's RLUIPA claim. RLUIPA requires a "more searching standard of review . . . than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." Lovelace, 472 F.3d at 186 (internal quotation marks omitted). Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that" the burden is "in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that . . . interest." RLUIPA § 3(a), 42 U.S.C. § 2000cc-1(a). Once "a plaintiff produces prima facie evidence to support a claim alleging a violation" of RLUIPA, "the government shall bear the burden of persuasion on whether [the challenged practice or law] substantially burdens the plaintiff's exercise of religion." Id. § 2000cc-5(4)(A).

To determine whether Terrell has established a prima facie RLUIPA claim, I must decide whether Terrell sincerely held his avowed beliefs and whether they are, in Terrell's own scheme of things, religious. United States v. Seeger, 380 U.S. 163, 185 (1965). RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "[T]he truth of a belief is not open to question, rather, the question is whether the objector's beliefs are truly held." Cutter, 544 U.S. at 725 n.13.

Terrell stated that he has been a practicing Muslim since 2003, and he asserted that his dietary restrictions arise from his sincerely held religious belief that he must eat food slaughtered,

10

prepared, and served according to Islamic or Jewish law. Although he voluntarily removed himself from the Diet while at Sussex I due to the food's alleged poor quality, he stated that he ate "as closely to [his] religious dietary beliefs as possible without going hungry" by eating the no-meat diet. (Pl.'s Aff. 1.) He claimed that he was forced to eat from the regular diet to alleviate a stomach condition created from the large quantity of beans he ate while on the no-meat diet, but he returned to the no-meat diet once the condition improved. Id. at 3-4. He also claimed that his religious scriptures permitted him to go off the Diet if the food would harm him or was not properly cooked. Id. at 3. Viewing Terrell's factual assertions in the light most favorable to him, I find that Terrell's dietary beliefs are religious and truly held.

The next issue is whether Montalbano's decision to defer Terrell's application for the diet imposed a substantial burden on Terrell's religious exercise. In the context of RLUIPA, the Fourth Circuit determined that a substantial burden "occurs when a state or local government, though act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Lovelace, 472 F.3d at 187 (quoting Thomas v. Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 718 (1981)). An inmate, however, could decide to be religious about fasting and still not be religious about other practices. Lovelace, 472 F.3d at 188. An inmate's right to religious exercise would be substantially burdened by a policy "that automatically assumes that lack of sincerity (or religiosity) with respect to one practice means lack of sincerity with respect to others." Id. (citing 42 U.S.C. § 2000cc-5(7)(A) (providing protection for "any exercise of religion")(emphasis added)); Reed v. Faulkner, 842 F.2d 960, 963 (7th Cir. 1988) (recognizing "the fact that a person [who] does not adhere steadfastly to every tenant of his faith" may still be sincere about participating in some religious practices)); but cf. O'Lone, 482 U.S. 351-52 (where

11

relevant inquiry for First Amendment, not RLUIPA, claim is whether the inmates have been denied *all* means of religious expressions, not for the specific religious practice allegedly violated).

Terrell claims that he has "no alternative available to practice [his] sincere religious dietary beliefs outside the Common Fare Program." (Pl.'s Aff. 3.) The meat and no-meat menus at VDOC institutions are not prepared according to Kosher guidelines. Non-Diet food items are stored, prepared, and served without the sensitivity accorded to Diet foods via Jewish or Islamic customs. (Def.'s Ex. A, Food Service Manual § 5(G)-(L).) VDOC's decision to defer Terrell's Diet decision meant that Terrell could not eat the kosher meals required by his sincerely held religious belief. Therefore, I find that the deferral imposed a substantial burden on Terrell's ability to practice his religious dietary beliefs, separate from his Islamic beliefs in general, because he was prohibited from eating kosher foods required by sincerely held religious beliefs.

Because Terrell has demonstrated that the six-month deferral imposed a substantial burden on his religious exercise, the burden shifts to Montalbano to show that the Diet's deferral policy "is the least restrictive means of furthering a compelling governmental interest." Lovelace, 472 F.3d at 189. In applying the compelling governmental interest standard, courts should give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quoting joint statement of Sen. Hatch and Sen. Kennedy, RLUIPA's co-sponsors). If defendants can provide "an explanation for the policy's restrictions that takes into account any institutional need to maintain good order, security, and discipline or to control costs," that explanation "will be

12

afforded due deference." Lovelace, 472 F.3d at 190.

Montalbano does not adequately demonstrate on the present record that the deferral policy is the least restrictive means of furthering a compelling governmental interest. She simply asserts that "[u]nless prisoners are entitled willy-nilly to be admitted to the [Diet], then the protocol employed in this section has to be viewed as reasonable. There obviously is a valid rational connection between the protocol and the government's interest in regulating what [sic] inmates are entitled to participate in the [Diet]." (Def.'s Mot. Summ. J. 4.) Despite this bald assertion, Montalbano did not present any evidence of the Diet's current costs versus other menus, the deferral policy's impact on VDOC's budget, or the impact on prison security.

She relies solely on the court's statement in Acoolla v. Angelone that as of July 2006 "the Common Fare Diet [was] much more expensive than the normal prison fare . . . ." Civil Action No. 7:01cv01008, 2006 U.S. Dist. LEXIS 62574, at *12 (W.D. Va. Sept. 1, 2006). However, Montalbano's reliance on 2006 food prices in Acoolla to carry her burden to show a compelling government interest is misplaced under Brown v. Peyton, 437 F.2d 1228, 1228 (4th Cir. 1971) and Lovelace v. Lee, 472 F.3d 174, 174 (4th Cir. 2006).

In Brown v. Peyton,[2] a Virginia inmate sued Virginia prison officials under § 1983

---

[2] The controlling Supreme Court precedent at that time was Sherbert v. Verner, 374 U.S. 398, 402-403 (1963). The law from Sherbert required defendants whose actions substantially burdened a religious practice to demonstrate a *compelling governmental interest* as justification. Id. Despite repeated changes in the law, the Sherbert standard substantially mirrors today's RLUIPA standard.

Sherbert was overturned by Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872 (1990), which held that generally applicable laws may be applied to religious exercise even in the absence of a compelling governmental interest. In response to the Court overturning Sherbert, Congress passed the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb et al. RFRA prohibited federal and state governments from substantially burdening a person's exercise of religion, even if resulting from a law of general applicability, unless the government could demonstrate that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). The RFRA was struck down as applied to the states in City of Boerne v. Flores, 521 U.S. 507 (1997), as an over exercise of Congressional authority under the Fourteenth Amendment. In response, Congress passed RLUIPA under

alleging, inter alia, that he had been denied permission to subscribe to the newspaper Muhammad Speaks and to purchase the book Message to the Blackman in America. The district court denied relief on the pleadings, after heavily relying on the Fourth Circuit Court of Appeals' decision in Abernathy v. Cunningham, 393 F.2d 775, 775 (4th Cir. 1968), holding that "this matter of censorship" was "solely within the sound discretion of [prison] officials[.]" Brown, 437 F.2d at 1230.

In Abernathy, an Virginia inmate sued Virginia prison officials two years before Brown for the right to subscribe to Muhammad Speaks and to purchase the book Message to the Blackman in America. The Abernathy court explicitly determined that "The Black Muslim teachings of Negro superiority and supremacy and of hatred for the white race are everywhere evident in the Message to the Blackman [sic]. . . . They are also present in Muhammad Speaks, although there they tend to manifest themselves not so much in the precise wording of the text but more in the entire tenor of the paper." Abernathy, 393 F.2d at 779. After reviewing the district court record, the Fourth Circuit affirmed the ruling that prison officials could censor that literature to further penological security interests.

Two years later in Brown, the Fourth Circuit Court of Appeals reversed the district court's reliance on Abernathy and remanded the case, holding, "The burden of proving the existence of [paramount state] interests rests on the state. The burden is not met merely by filing of an answer which controverts the allegations of the complaint or which relies solely on our previous decision in Abernathy . . ." Brown, 437 F.2d at 1231. The Fourth Circuit concluded that, absent any other evidence, an evidentiary hearing was necessary to determine whether the

---

its spending clause powers with terms nearly identical to RFRA.

denial of constitutional rights could be justified by superior state interests even though the Fourth Circuit had previously held just two years earlier that prison officials could regulate the same two publications. Id. at 1232. The Fourth Circuit recognized that the views in a periodical could change over time, the book may have been accepted at other prisons across the United States, or the inmates' needs for the book might have been different. Id. Most importantly, however, was the court's conclusion that:

> We did not, however, hold that prison officials' judgment was final and unreviewable. The district court decision affirmed in Abernathy was based on "an exhaustive evidentiary hearing" and on the finding that the censorship had been based on a "valid and justified concern" with discipline on the part of prison officials. We verified the findings by "close examination of the book and issues of the newspaper." Abernathy thus recognized the probative value of prison officials' judgment, but also recognized the necessity of review of the decisions of prison administrators to insure that the constitutional rights of prisoners are protected.

Id. at 1231-32.

Montalbano similarly relied on Acoolla to prove the Diet is perpetually prohibitively expensive. However, the Acoolla court heard two witnesses testify that the Diet was more expensive than the regular diet; one witness was a special programs manager, and the other witness was the VDOC food service director. Montalbano did not provide any reasonably similar evidence as provided in Acoolla. Citing a prior finding of fact surrounding a 2006 food service contract, which included varying costs for food, personnel, and materials, did not relieve me of my obligation to protect prisoners' constitutional rights by reviewing current prison officials' acts, nor does it excuse Montalbano's burden to show a compelling government interest.

Montalbano's reliance on Acoolla is also not compelling for two additional reasons. The

15

Acoolla court noted in its opinion that the kosher meat for the Diet in 2006 came from a particular vendor, other no-meat items for the Diet varied in cost, and the total cost included supplies, preparation, and serving. 2006 U.S. Dist. LEXIS 62574 at *11 n.5. All three bases to calculate costs fluctuate independent of each other. Vendors for state contracts compete each year by bidding, human capital costs vary, and food prices seasonally rise and fall. I cannot say today that the Diet is much more expensive than the normal prison fare because Montalbano did not present any current evidence to support the claim. Furthermore, the fact that the Diet was more expensive in Acoolla was merely dicta because the court determined that Acoolla's sincerely held belief was not substantially burdened. The court noted in its opinion that it therefore did not need to discuss the government's compelling interest under RLUIPA. Id. at *32-33.

Without relying on Acoolla's 2006 Diet costs, Montalbano failed to justify a compelling government interest. In addressing the plaintiff's RLUIPA claim in Lovelace, the Fourth Circuit noted that the defendants had not presented any substantive explanation of the government's compelling interests. Instead, the defendants simply "assert[ed] a 'legitimate interest in removing inmates from religious dietary programs where the inmate flouts prison rules reasonably established in order to accommodate the program.' They d[id] not elaborate how this articulated 'legitimate interest' qualifies as compelling; they d[id] not present any evidence with respect to the policy's security or budget implications." Lovelace, 472 F.3d at 190. The Lovelace court noted that it could have created and justified its own explanation for the government's compelling interest, but to do so would "effectively relieve[] [prisons] of their responsibilities under RLUIPA[,]" and "court-generated explanation would cut severely against

16

Congress' intent to provide inmates with greater protections. . . of religious exercise." Id. at 193. The warden and the ombudsman manager in Lovelace subsequently submitted affidavits that provided substantive explanations to the district court of compelling governmental interests, and the court accordingly granted summary judgment.[3]

In the instant case, Montalbano's all-or-nothing argument is that the deferral has to be reasonable; otherwise, inmates could freely practice their religious dietary needs in conformity with their First Amendment rights. To prevent this possibility, she asserted that a valid and rational connection does exist for the deferral; but, as in Lovelace, she neither elaborated how this unarticulated valid and rational connection qualifies as compelling nor presented any evidence with respect to the policy's security or budget implications. She also claimed that deferrals of prisoners' Diet applications for six months cannot be viewed as a substantial burden of religious exercise if a prisoner has been on the Diet but voluntarily withdraws. However, according to the Food Service Manual, an inmate, like Terrell, who withdraws from the Diet is automatically placed on a one year deferral from reapplying for the Diet. (Def.'s Mot. Summ. J. Ex. A, Food Service Manual § 5(N)(1).) Montalbano failed to explain how an additional six months discretionary deferral on top of the standard one year deferral relates to a compelling governmental interest.

Montalbano did not present any evidence in the instant matter of the Diet's food, supplies, preparation, or serving costs. Montalbano did not present any evidence of the prison's ability to afford any extra expense of Diet meals without first inquiring into the sincerity of an

---

[3] Compare Def.'s Br. / Mem. in Supp. of Mot. Summ. J. (with Aff.s) (Mar. 24, 2008) (docket entry #32) with Lovelace v. Lee, No. 7:03-cv-00395, Def.'s Br. / Mem. in Supp. of Mot. Summ. J. (with Aff.) (May 1, 2007) (docket entry #73).

17

applicant's religious beliefs. Montalbano did not present any evidence indicating that she relied upon any such concerns in deferring Terrell's application. See Lovelace, 472 F.3d at 190 (defendants failed to establish a compelling interest where they failed to present sworn statements from prison officials discussing security, safety, or cost consideration justifying restrictions in Ramadan policy); Baranowski v. Hart, 486 F.3d 112, 125 (5th Cir. 2007) (policy found to further prison's compelling interests where evidence established that prison's budget was not adequate to cover the increased expense of either providing a separate kosher kitchen or bringing in kosher food from the outside).

Given the lack of evidence to support Montalbano's justification for imposing a six-month deferral period, I cannot conclude at this stage that the asserted interest is compelling as a matter of law. Accordingly, I will deny Montalbano's motion for summary judgment as to Terrell's RLUIPA claim.

## VI.

For the foregoing reasons, Montalbano's motion for summary judgment will be granted as to Terrell's First Amendment claim and denied as to Terrell's RLUIPA claim. I will dismiss Terrell's First Amendment claim against the Chief of Operations, Offender Management Services, and I will terminate him as a defendant to this action.

Terrell's request for injunctive relief will be denied as moot since he has been subsequently approved for the Diet. Terrell's motion for default judgment will be dismissed because Montalbano replied and Defendant Chief of Operations, Offender Management Services will be terminated as a defendant. Terrell's motion for summary judgment will be dismissed as the issues have been adjudicated. Montalbano will be directed to file another motion with

18

supporting affidavits as to the remaining RLUIPA claim. An appropriate order will be entered this day.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to the plaintiff and counsel of record for the defendants.

**ENTER**: This 21st day of October, 2008.

*Jackson L. Kiser*
Senior United States District Judge